The case on today's docket is the case of Illinois Environmental Protection Agency v. Illinois Solution Control Board and Prime Location Properties. We have Mr. Brett Reicher for the appellant. We have Lee Tipsoro for the appellee. And perhaps we have Mr. Patrick Shaw for the appellee as well. And you've designated 10 minutes each of your time. So you may proceed when you're prepared to Mr. Reicher. Before you begin, before you start to talk, we have had a motion to cite additional authority. And I guess I need to know whether or not the other party has been apprised of this beforehand and would want to, so that we can determine whether or not to argue it. Your Honor, we received the motion on Friday. I am prepared to argue the case. Okay. You may proceed. Thank you very much. Thank you. Good morning, Your Honor. May it please the Court. My name is Brett Reicher. I'm the Assistant Illinois Attorney General and I represent the Illinois Environmental Protection Agency in this matter. Your Honor, this Court should reverse the decision of the Illinois Pollution Control Court and uphold or reinstate the Illinois Environmental Protection Agency's decision in this case, denying Prime Locations' petition to include corrective action concerning five underground storage tanks at the Metropolis, Illinois site in its corrective action plan and thus reimbursable under the Leaking Underground Storage Tank Fund, pursuant to the previously reported incident. Your Honor, this Court should reverse for two reasons. First, the Pollution Control Board lacked jurisdiction to consider Prime's petition. Second, the Pollution Control Board ignored the preclusive effect of the agency's prior determination that limited the scope of the corrective action associated with this incident to two underground storage tanks at the location. That does not mean that Prime could not receive reimbursement from the Lust Fund for the other five underground storage tanks when it needed to go through the proper procedure, creating a new incident, going through the 25, 45-day reporting requirements, etc., to accomplish that. It failed to do any of that. Additionally, if this Court does uphold the decision, the Board erred in awarding attorney's fees to Prime. Turning to the first argument, Your Honors, which is the jurisdiction argument. The Environmental Protection Act provides parties with 35 days to appeal certain decisions of the Illinois Environmental Protection Agency to the Pollution Control Board. An Environmental Protection Agency decision modifying or denying a corrective action plan is one such decision. There is no question or debate that that's a jurisdictional time limit. As such, the parties cannot contrive jurisdiction. They cannot enter non-proton orders to provide the agency with jurisdiction. Only one petition for review of the agency's decision was filed within the 35-day jurisdictional time limit. If that petition was legally ineffective, then the Board had no jurisdiction to consider the subsequent amended petition for review of the agency's decision because there would be nothing effective for that amended petition to relate back to. No timely petition for it to relate back to. The statutory scheme regulating this case is essential to provide context for this argument. First, the Illinois Attorney Act provides that parties must be represented by an attorney in court or an adjudicatory proceeding, unless the party is proceeding pro se, of course. The Attorney Act specifies that it applies not just to court proceedings, but also to administrative actions, adjudicatory administrative actions. In fact, the Attorney Act goes so far as to specify which administrative proceedings are accepted from this rule. It specifies that proceedings before the Civil Service Commission, before a police merit board, and before the labor relations agencies are accepted from this rule. The obvious implication from this, or obvious import of this, is that pollution control board proceedings are not accepted from the requirements of the Attorney Act. The Attorney Act requirements apply to these proceedings. As if there were any doubt of the application of that rule, the Board's own administrative regulation shows that it applies. And that's Board Regulation 101.482, which provides that corporations and proceedings before the court must be represented by counsel, and that regulation cites the Attorney Act as authority. The second statute that's of significance here is the Corporation Practice of Law Prohibition Act. In the Corporation Practice of Law Prohibition Act, the General Assembly went a step further. While the Attorney Act already specified that parties must be represented by attorneys in adjudicatory proceedings, the General Assembly went so far as to create another statute specifying that it is unlawful for a corporation to appear in any proceeding except through counsel. The General Assembly's intent then was to create an extra layer, or an extra requirement, concerning corporations appearing in these proceedings. And again, Board Rule 101.482 explicitly incorporates this statute as well, and its requirement that a corporation may appear before the Board via an attorney only. These rules give rise to what courts have called the Nullity Rule. The Nullity Rule provides that if a party appears in court not represented by an attorney, then the proceedings are void ab initio. With specific regard to corporations appearing in adjudicatory or judicial proceedings via someone else other than an attorney, generally through a member of the corporation, as happened here, courts have, for decades, determined that those proceedings are void. The Nullity Rule applies in its strictest form. That's consistent with the fact that not only does the Attorney Act create the rule, but the General Assembly strengthened that rule in the specific corporate context by the Corporate Practice of Law Prohibition Act. And this rule, as applied to corporations, includes cases discussed by the agency in its briefs, including the Siak-Pair decision, the Edwards v. City of Henry decision, on that side, we cited cases in Tomsell, and other cases going back to the Sixth. The Illinois Supreme Court, in Apelbaum, softened the rule, recognizing its harshness, made it essentially a case-by-case determination requiring the court to look to whether the purposes of the Nullity Rule would be given effect by its application or not. But Apelbaum was not a corporation case. Apelbaum certainly involved an individual represented by an attorney who just wasn't on the active role at the time. A licensed attorney, it appeared, is not somebody who is on the active roster. Apelbaum did not specifically address the long list of cases giving a strict application to the Nullity Rule in corporation matters. The Board has cited the February 3rd decision of the First District Appellate Court in double disposal. In double disposal, the Appellate Court applied the softened Nullity Rule in the corporate context. In response to that decision, the agency makes a couple arguments. First, it should be noted that this February 3rd decision is not final yet. It's subject to a petition for legal appeal. It's subject to a petition for a rehearing. The decision itself is not yet final. Next, while that case did apply the softened Nullity Rule, the court did not discuss the effect of the corporation's practice of law prohibition. There's no meaningful discussion. It recognized the cases cited by and relied upon the agency, including Seachter, and it sought to distinguish them on the basis of Apelbaum, but there's no meaningful discussion of the statutory scheme that provides reason for a more strict rule with regard to corporations practicing law. Indeed, all the other cases providing for or addressing this softened Apelbaum Nullity Rule were not corporate scenarios. Even subsequent Apelbaum cases that looked at the Nullity Rule, when it involves a corporation appearing in a proceeding by a non-attorney, the Edwards v. City of Henry case, applied it in a strict form. The agency submits that the double disposal case in that regard was incorrect. It did not address or even mention the effect of the corporation practice of law prohibition act or prohibition law on this rule, nor did it meaningfully address the long line of cases strictly applying this situation in the corporation context. The one case, the one case double disposal discusses in which the Nullity Rule was not strictly applied in a corporation context was the Mushan v. Bushan case in which there was a complaint filed by a non-attorney on behalf of the corporation, but the court made sure to note that the complaint purported to state that the corporation appeared by its attorney, even though the complaint wasn't signed by the attorney, the complaint itself stated that it appeared by its attorney, and the court in Bushan made sure to note that the corporation in fact was represented by an attorney at every stage of the proceeding. At every stage of the proceeding. A very distinguishable case from here. For those reasons, the Nullity Rule should apply in a strict sense here. The application of that rule means that the first petition from the agency decision filed with the board by a individual member, Keebler, was ineffective. As a result, the amendment of that, after the 35-day jurisdictional limit, was insufficient to confer jurisdiction because the amendment wouldn't relate back to a legal nullity, and you can't relate back to a legal nullity. The board attempts to argue, under the statute and its regulations, that an applicant is allowed to appeal from an agency decision, such as this one, to the board, and that means that a corporation can appeal apparently through its own members. But an applicant, the language in the Environmental Protection Act saying that an applicant to the Environmental Protection Agency for approval of a corrective action plan may appeal says who may appeal. It doesn't say how they may appeal. And the answer of how they may appeal or appear is answered in the statutes I've discussed as well as the board's very own rule, 101.482. It says corporations must appear before the board of counsel. The board purports to create an exception to its written rule that when a corporation appears through somebody other than counsel, through somebody other than an attorney, they will accept the petition and then require an amended petition. But the board's own rule doesn't say that. Insofar as that's what the board's rule is, that needs to be in the regulations. It needs to go through the Administrative Procedure Act and go through JPR approval. Otherwise, the board is required, as agencies are, to apply the rules as written. Turning to the second issue, which concerns the 57.7c4 of the Environmental Protection Act. Under that provision, the Environmental Protection Agency's modification of a corrective action plan is immediately appealable. In November 2005, the agency wrote to Prime's predecessor explicitly and told Prime's predecessor that only two USDs have shown evidence of a possible release, and therefore only they are associated with this incident. Any additional USDs that are found on site and contamination that may be associated with those additional USDs must be reported as a new release and addressed accordingly. Prime's predecessor stated that while it disagreed with that, to move the state forward it will modify its corrective action plan to include only corrective remediation efforts addressing the two underground storage tanks. Prime did not appeal that decision. Its failure to appeal has to be given effect. Instead of appealing, it made the choice to modify its decision. Therefore, the scope of the corrective action plan, from that point forward, for that incident was limited to the two underground storage tanks. That is the scope for which, under this incident, reimbursement may be gained from the underground storage tank fund. It does not mean that if the other tanks at site were found after all these years were found and shown to be leaking, that they could not be subject to a different corrective action plan. But they were not part of the scope of this decision. While the board argues that nothing prevents it from considering new facts, that's true. It is definitely the case that when parties start picking on a site, they're going to discover some new things. And the statute needs to be flexible to accommodate that. But, in this case, the new facts could only relate to the two USDs, the two underground storage tanks, that were part of the defined scope of this incident for the purposes of reimbursement under this incident number from the fund. Again, the General Assembly gave the party the option of either modifying or appealing the decision. Instead of appealing the decision, saying that under this incident number, you can receive reimbursement for the corrective action plan concerning two underground storage tanks, instead of appealing that, Prime's predecessor modified his decision and incorporated that, thus limiting the scope, and that needs to be given the preclusive effect. The General Assembly provided for appeal rights from that type of decision, so as to provide some sort of finality. This had already been going on at this point for several years, in fact. The release was initially reported in 2001. By 2005, parties still had not found or identified any release from any of the other storage tanks. They didn't even know where they all were. At that point, the agency reasonably concluded that, look, something has to happen here. We know there's these two storage tanks. You can go ahead, you can do a corrective action plan with regard to those. If other things are found, then you must treat that as a new release, and we can address that accordingly. And Prime's predecessor said, yes, fine, we'll modify it and do that. That precludes them, the failure to appeal that and modify, but instead modify their corrective action plan, limiting the scope of that incident has a preclusive effect and cannot be reopened many years later, several years later, as we purported to do in this case. Finally, Your Honors, if the court affirms the board's action, it should nonetheless find that the board abuses discretion in awarding attorney's fees to Prime, which is reimbursable through the Lust Fund, because the statute, the statute does not have a broad remedial effect. The statute is, in fact, the Lust Fund is a state fund without significant or a large amount of assets. Consistent with this, the board under 57.73 needs to examine corrective action plans and make sure that parties are not receiving reimbursement for anything other than, and what's necessary to comply, to bring the site into minimal compliance with the statutory standard. The board has a duty to ensure that no extra costs are being added in. All of the statutory scheme shows that large awards of attorney's fees are not contemplated by, especially where there's no actual evidence that the cost of the fees were actually borne by the party in this particular case. For these reasons, Your Honor, if you have no other questions, I'd ask that this court reverse the Christian Cohort decision and reinstate the agency's decision. Thank you very much. Thank you, Mr. Lightner. You'll have the opportunity to talk about it. Thank you. And at this time, I'd like to say that Marie Tipsora is at the margin for Illinois PCV at 10 minutes. Thank you. May it please the court, my name is Marie Tipsora and I'm a special assistant attorney general appointed, I'm a board attorney appointed as a special assistant attorney general. The Illinois Pollution Control Board's decision that prime locations appeal was timely and conferred jurisdiction on the board is consistent with the Environmental Protection Act and the board's rules. Now, the agency has spent a lot of time talking to you about the Attorney Act and the corporation practice of the Law Prohibition Act. However, the board is a creature of statute. Our authority to act comes from the Environmental Protection Act. And the Environmental Protection Act's plain language allows an applicant to file an appeal of an agency decision. Thus, jurisdiction to hear those appeals comes to the board under that specific statutory language. An amended petition was directed in this case not to cure any jurisdictional defects, but to ensure that the board's rules were followed. The board cannot, by rule, circumvent the plain language of the Environmental Protection Act and has not done so. Nowhere in the Environmental Protection Act does it require an attorney to file for the applicant, and the board's rules do not either. The board's rules of Part 105, which specifically deal with appeals to the board from an agency decision, mirrors the language of the Environmental Protection Act and says that an applicant may file an appeal. The board's rules of Part 101 then also require that a corporation appear before an attorney. The board has not found that the filing of an appeal with the board is the practice of law. And, in fact, the entire process leading up to the filing of the petition with the board is one that's not necessarily involving attorneys and generally doesn't involve attorneys. For example, the agency's denial letter, which frames the issues before the board and tells the board what to look at and what to determine whether the denial is correct, is signed by a non-attorney. The applicant can then appeal that non-attorney's letter to the board. The board is cognizant that we cannot read the Environmental Protection Act in a vacuum. We have to look at the Attorney Act and the Corporation Practice of Law Prohibition Act, but we read those with the Environmental Protection Act. Neither the Attorney Act or the Corporation Practice of Law Act requires dismissals of a case initiated by a non-attorney. But to be cautious, the board for the last 10 years has a procedural rule in place that says that if a corporation appears before the board, they must then do so by having an attorney file an appearance. That's what the rules in 101 say. In this way, the board's process takes the plain language of the Environmental Protection Act, which allows an applicant to file an appeal, and we also then read it with the Attorney Act and the Corporation Practice of Law Prohibition Act. The board has no authority to enforce either the Attorney Act or the Corporation Practice of Law Prohibition Act. Those are not our statutes to enforce. We, however, are charged through our enabling statute with hearing appeals filed by an applicant. The applicant filed that appeal within 35 days. No one disagrees with that, and that conferred jurisdiction on the board. Again, the board has never found that the filing of that petition is the practice of law. And only if that is the practice of law would we even get to the nullity rule issue. And in this case, the board, in reviewing, if this court were to decide that's the practice of law, and the board has said if that is the case, the nullity rule should not be applied here. Again, the nullity rule only applies if there's an unauthorized practice of law. The nullity rule, according to ECHO Law, is harsh and should not apply except when protecting the public and the integrity of the court system. Applying the nullity rule in this case is not protective of the public or the integrity of the board system. First and foremost, again, the Environmental Protection Act allows a non-attorney to file an appeal with the Pollution Control Board. If we were to dismiss those or say that is a nullity, prime locations would not have the opportunity to be heard on its petition. And in this case, the board found the prime locations petition had merit and, in fact, found for prime locations. Only the initial petition was filed in this case before an appearance was filed by an attorney. No substantive action took place, including the fact that the agency's record in this case was not filed. It's after the amended petition and after the appearance by an attorney. In addition, once an amended petition is filed, the board extends its statutory decision deadline for the full 120 days. So the board's process is not shortened. Thus, this procedure that the board has followed for the last 10 years does protect the litigant. It also protects the board system. And applying the nullity rule is not warranted under the Applebaum case. Now, the double disposal case that we've asked to cite, the agency does talk about it a little bit, so I'd like to address it briefly. It is the first district, and we agree it's not yet final. There's a 35-day attempt to possibly appeal that. But it specifically addressed sick repair, which is the case that the agency seems to rely on the most and argues that it's the most on point. And that decision in the first district was decided before the Applebaum case. They then apply the Applebaum, not automatic nullity rule, but look at the facts and look to see if the system is protected and if the public is protected. And they found in that situation that, in fact, the nullity rule should not have applied. That situation is very factually similar to here. So even if this court is to decide that the filing of a petition for review is the practice of law, then this court should not apply the nullity rule. Likewise, the board's decision awarding legal fees is supported by the plain language of the Environmental Protection Act. The specific language of 57.7L of the Environmental Protection Act allows the board to assess legal fees when the owner prevails before the board. The owner prevailed here. Prime location won its case before the Pollution Control Board. The act was amended to specifically allow those types of fees to be included as a reimbursable cost. Now, the board had previously allowed legal costs that were correct in action, but not legal costs that were sought with reimbursement of fees. There was a subsequent amendment to the act that made it clear that if the owner prevailed before the Pollution Control Board, then the owner could get legal fees. Now, the IEPA is arguing that somehow the board's granting of the legal fees undermines the meaning of the statute in keeping costs to a minimum and somehow keeps the fund from being protected. However, the IEPA did not object to the legal fee cost before the board except to challenge the two differing rates. They never challenged the reasonableness of the fees. Therefore, they've acquiesced to the fees as being reasonable, and that argument was waived. Furthermore, there is no requirement in either the statute or the act, or either the act or the board's rules, that require that proof of payment be made on the issue of legal fees. Merely, and in fact, the board's rules don't require proof of payment for anything except in the case of handling fees, if you're trying to get handling fees for paying subcontractors, you have to demonstrate that you paid the subcontractor before you can get handling fees under the board's rules. So, the agency's arguments have to fail here because prime locations did prevail in this instance. And I'm briefly going to touch on the facts of this case, but I'm going to leave most of that to Mr. Shaw. I would just like to address the standard of review that this court should apply in looking at the issue of whether or not the 2006 release was a new release. The board's decision is based on the IEPA's denial letter. That's what we look at. The IEPA's denial letter says this is a new release. And the board then examines that denial letter and looks at the facts. The standard of review should be the manifest way to the evidence standard. That's the standard set forth in Section 41B of the Environmental Protection Act. And numerous cases have applied the manifest way to the evidence standard in these cases. This case is very similar to a 2008 3rd District Permanent Appeal case, the Environmental Protection Agency versus Pollution Control Board. And there, the court applied the manifest way to the evidence standard when the board decision involved applying the facts to the law. The Supreme Court, in 2007, in town and country, reiterated the manifest way to the evidence standard as appropriate when looking at landfill sightings and also for permanent appeals. For these reasons, I urge you to affirm the Pollution Control Board's decision. Thank you. Thank you, Ms. Gibson. Mr. Shaw, you have 10 minutes. Please be seated. Please report, counsel. My name is Patrick Shaw. I am the attorney for Prime Location Properties in this matter. Prime Location Properties was, as noted, the second owner on the property. The Pollution Control Board's decision in this matter, as the court has probably observed, is fairly voluminous and very detailed in its facts, so I don't want to go through that. But it's a fairly good annotation of the more voluminous record that was reviewed by the parties and has been developed over the years. The subject property, just by looking at some of the very basic details, lets you know what the problems were. It had seven tanks on it. Some of them had not been in use since the mid-'80s. All of them had not been used since 1995. I don't know what the law was at the time. That's a no-no today. Tanks have got to get out of the ground if you're not using them. They can't be sitting there. What happened around 2001 was an incident was reported to the Illinois Emergency Management Agency reporting a release of gasoline from all seven tanks. And with that event, the responsibility and obligation fell upon the owner of the property, and I guess I don't have their name at that time, to start moving forward with dealing with the problem that they had identified. In the Illinois Environmental Protection Act, as it's been modified over the years, dealing with the problem has a number of different components, and one of them is investigation. That's considered a cleanup activity. You've got to figure out what you've got there. Another crucial part of the act as it's emerged is, well, maybe there's some things that can stay in the ground. So when we talk about dealing with it or taking care of it, some of the times what we're trying to do is just figure out the extent of the release. And if the small amount of contamination that is observed is not going to hurt anybody, there's a significant amount of rulemaking on that subject, which is called the tiered standards of remediation. If it's in a remote area, it's not likely that kids are going to be eating the soil in the pit. What's the condition of the property? An investigation of the property is what we mean by cleaning it up. This property had a unique problem. Probably not a unique problem, but the problem that parts of the tanks that are on the property were inaccessible. That doesn't mean that they're not identifiable. The tank systems are usually connected by pipes and lines that run from various parts of the property to the central pumping location. And that's another problem with these types of facilities. You could have releases in one tank and they'll sort of migrate along the pipes and the openings allowed by that substructure and deposit contamination in another property. The problems become fairly intermixed. And gas is a fungible product. Gas leaked from one tank is going to look like gas leaked from another tank. But the responsibility or obligation upon making these releases is to start with the system. And the system requires that the site be cleaned up or we determine that it doesn't pose a problem, that the amount of contamination is de minimis or minimal or meets the regulatory standards. These tanks have not been closed down. There's nothing in the record to say that the tanks have been cleaned. The investigation was impeded by the Illinois Environmental Protection Agency acting as an insurance company in this case, precluding the investigation that they thought might be more excessive than necessary. They didn't want to have the fund paying to access the tanks that are partly concealed by other structures on the property. Removing those structures to investigate this extent of contamination would be something that the fund would have to pay for. And so several steps and several different efforts along this process were initiated to try to figure out if they can determine the cleanliness of the property without removing these impediments to the investigation. And, again, there was no willingness on the agency's part to agree to removing those, yet there was never any investigation that could be done on this property, given other barriers around it, to rule out that there couldn't be any contamination under there. The record shows numerous incidents of the agency denying something, suggesting something else, the consultant saying, okay, we'll do that for now, we'll see if that works. That's how this process works. It's a given take. Nobody knows what's under the ground until you pull, you really pull it up. And the, I mean, it wasn't really necessarily surprising, given these old tanks, there was contamination when they did pull those up, but in that instance, my client, the subsequent owner of the property, did that under provisions under the Act, which allow an exception from prior planning approval, but they do that at some risk, that those costs may end up being not reimbursable. But we fell within that exception, the board found that we fell within that exception, but they sort of put the burden back on us to basically put our money where our mouth is. If you think there's contamination down there, you pull it up, which is what we did. It's contaminated. I think there's any question about that. What is being attempted here is another insurance company idea of trying to create two different properties, two different cleanups on the property of a gas station with old gasoline tanks that are all connected by lines and pipes with each other. And the purpose of that is that given in the agency's notes, we want them to pay another deductible. We want two deductibles on this property. We want them to start over and work it out again. The deductible in this case would be another $10,000. This is not a new issue. This has been before the board about the number of deductibles on the site more than once. You might think twice or three times. I tell my clients you're not required to do a second deductible. The way the Act is written, the way the board has interpreted it, you clean up the property. You don't sit there and try to figure out what tank is doing what. It's a waste of time. So we appealed that decision. The board affirmed it. The idea that there is some statement made in the letter by the agency in the previous denial that has preclusive effects towards the truth is going to be very perplexing if it is applied to the agency because the agency's process is itself an emerging process. It finds out more information. It changed its decision. Part of the process is investigating the site. It's underground. What do we find out? What do we learn? And then when it's all over, if it's all cleaned up, you get an open remediation letter. You're out of the program. It's cleaned up. There may still be gasoline on the property,  and, again, those tanks have not been closed out and remain an issue. I also wanted to quickly address the legal fee issue. After the case was decided in our favor, I filed a motion for award of attorney fees. That motion attached to it the fees incurred in this case. In fact, the affidavit says these are the fees incurred in this case. There seems to be a little bit of jockeying on the language. I think there's something. Sometimes attorneys come in and say, well, I think this was the value of my services. These are the fees that were billed to the client. These aren't necessarily the fees that have been paid to the client at the time the affidavit was submitted. The process of all this program has, I think, 120-day deadlines. The agency has got to look at applications and decide what to do in 120 days. The applicant has 30 days, I guess, to figure out what they want to do. If they want to file an amended plan or agree with the agency, they go to the board. Obviously, they've got the 35-day limit. The board has 120 days. The way I bill services, and this is not mostly due to environmental law, but it's for a wide range of entities, is at the end of 30 days, we put them all together, review the bills, send them out. In a 120-day timeframe, I'm very likely to have most of the bills or half the bills out to the client. That's just a practical matter. I think I referenced it into one of the briefings. These are the fees incurred. They're not all paid. I mean, that's true, but I'm not aware of any legal requirement for them to be paid. There's no law or requirement, I know, in general court law outside of environmental practice. It appears that the argument is being made that the Lust Fund is somehow different. That it is for purposes of reimbursement. As a counsel for the board has said, that's not really how the Lust Fund works. The Lust Fund pays out corrective action costs based upon bills and invoices from people that say, here's what the cost was. But it also just needs to be, what I want to really emphasize here is the cleanup costs go to the agency. Those are assembled over time through, you know, once the owner has all his invoices and bills and proof of whatever he wants to do to say, this is how much I owe, this is how much the fund should pay me. He sends that to the agency for their review, and they'll review it for 120 days. The board has 120 days to do a lot of things under its docket. Not just these underground storage tank cases. It's got permit appeals. It's got other things. It's got statutory decision deadlines to run through. The idea of actually making clients pay their legal fees in that kind of process, I think, is not a fair reasoning of how the act was meant to be applied or interpreted. That's the work side. Thank you, Your Honor. Thank you, Mr. Stelzner. Mr. Langner, do you have rebuttals? Briefly, Your Honor. Thank you, Your Honor. Just a couple quick points. Your Honor, we have failed to hear answers to two important points today. One is the fact that the Attorney Act specifically states that certain administrative agencies are accepted from the requirement that parties appear through attorneys in those proceedings. And the Police Control Board is not one of those parties. There's no answer. The Police Control Board offers no answer to the effect, the legal effect, the fact that while the statute specifically exempts or accepts certain administrative proceedings, it is not one of them. Additionally, there's no answer to the preclusive effect of the November 2005 modification of the plan by the agency. The General Assembly provided that. When that is so modified, a party can modify or appeal.  The party chose not to appeal. There is meaning to that within the General Assembly's scheme. And the parties never address that, never address the fact directly like, what does it mean that they didn't appeal? What it means that they didn't appeal is that they accepted that for the purposes of this plan, this remediation and payment under this incident, we're looking at two USTs, two underground storage tents. While the board purports to read the statutes together, it is in fact just reading its own applicant language under the Environmental Protection Act in isolation. It argues that the Environmental Protection Act does not require an attorney to file for an applicant. Other statutes don't specifically state that corporations may not appear on their own behalf either. That's why we have the Attorney Act. That's why we have the Corporate Practice of Law Prohibition Act. These apply to rules for all those other proceedings. And those rules are applicable here because pollution control proceedings were explicitly not exempted from the attorney-at-large requirements. Finally, turning to Applebaum, Applebaum did not discuss the Corporate Practice of Law Act or that scenario. Inherent in the General Assembly's decision to go beyond the Attorney Act and provide a separate statute outlawing corporations appearing in proceedings by themselves is an indication that that, the mere fact that a corporation appears in a proceeding not through an attorney is an inherent risk to the system. That's exactly what, even under the Applebaum Purposes Test, that's exactly what the knowledgeable was meant to apply. The General Assembly, by enacting the Corporate Practice of Law Act, said there's too much of a risk here. It's an inherent risk. You can't do it. That's why the strong knowledgeable should apply in situations where corporations appear not through an attorney. And that's consistent with the case law going back decades. And finally, Your Honor, with regards to the argument that the Environmental Protection Agency is acting as an insurance company here, the Environmental Protection Agency is doing what it is required to do under the Environmental Protection Act, which is to make sure that funds reimbursed under the loss fund are those, only those that are required to bring the site into minimal compliance with the statute. The agency, just like the Fish and Control Board, is a creature of statute and is simply doing what it is statutorily required. If Your Honors have no questions, then we respectfully request that the Fish and Control Board's decision be reversed and the agency's decision be reinstated. Thank you very much, Your Honors. Thank you. Thank you, ladies and gentlemen, both for your arguments and briefs. I would like to state with record that we are allowing the motion to cite additional authority filed by the Online Pollution Control Board. At this time, we're going to take a brief recess. Thank you.